UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NORTHSHORE STEEL, INC., )
)
      Plaintiff, )
)
v. ) No. 08 C 2147
)
LAKEHEAD CONSTRUCTORS, INC. ) Judge Rebecca R. Pallmeyer
)
      Defendants. )

## MEMORANDUM OPINION AND ORDER

In March 2006, Plaintiff Northshore Steel, Inc. ("Plaintiff" or "Northshore"), a fabricator of metal products, entered into a contract with Defendant Lakehead Constructors, Inc. ("Lakehead" or "Defendant"), a general contractor for industrial projects. Northshore agreed to provide Lakehead with steel trusses and other materials for a construction project in Michigan, and arranged for a third party, Reliable Galvanizing Company ("Reliable"), to galvanize and deliver the trusses to the construction site. When the materials were delivered, Lakehead employees found cracks in the welding of the trusses and, after repairs were made, Lakehead paid to have the repaired truss sections tested. Plaintiff claims Lakehead has breached the parties' agreement by deducting the cost of the load testing from the contract price. Lakehead contends the cost of the load testing was a reasonable expense it incurred due to Plaintiff's breach and has moved for summary judgment. For the reasons stated here, the motion is granted.

## FACTUAL BACKGROUND

### A. Contracts

In October 2005, Lakehead entered into a contract with Consumers Energy ("Consumers"), a utility company that provides electric and natural gas service to Michigan residents.[1] Lakehead agreed to serve as general contractor and provide materials for the construction of the J.H.

---

[1] *See* http://www.consumersenergy.com/content.aspx?id=1332, last visited March 10, 2011.

Campbell Backup Fuel Handing System Upgrade (the "project"), at Consumers' J.H. Campbell Complex, a power plant near West Olive, Michigan (the "jobsite"). (Def.'s 56.1 ¶ 6.) The firm of Krech, Ojard & Associates ("KOA") served as the primary architect for the construction project; David Krech ("Krech") was the lead engineer. (*Id.* ¶¶ 6, 24.) In March 2006, Lakehead entered into a subcontract with Plaintiff under which Plaintiff agreed to furnish necessary materials for the fabrication, coating, finishing, and pre-assembly of several trusses and chutes that would be used to transport heavy loads of coal at the jobsite. (*Id.* ¶ 7.) The subcontract specifically required Plaintiff "to fabricate the different sections of the trusses, have each fabricated section galvanized, and deliver the galvanized sections to the [jobsite] for assembly."[2] (*Id.* ¶ 11.)

Some time after Plaintiff fabricated the truss sections in the spring or summer of 2006, David Larson, Plaintiff's plant manager, called Michael Eisner ("Eisner"), the president of Reliable Galvanizing Company, to determine whether Reliable could galvanize the truss sections. (Larson Dep. 18:4-21, Nov. 11, 2009.) Larson faxed Eisner a sketch of the truss section dimensions. (Def.'s 56.1 ¶ 12.) After reviewing the size of the trusses, Eisner warned Larson that the trusses "would warp in the [galvanization] process." (Eisner Dep. 11:1-7, 13:2-4.) Larson himself made a note of Eisner's warning, writing the words "will warp" beneath a sketch of the truss, but Northshore nevertheless chose to proceed with the galvanization process. (Larson Dep. 24:2-9, Nov. 11, 2009.)

**B.    Galvanization and Damaged Trusses**

Soon after this conversation, Plaintiff shipped the pre-fabricated trusses to Reliable's plant in Chicago, Illinois. Upon their arrival at Reliable's facility, Dale Wolak, Reliable's plant manger, and other employees determined that the galvanizing the truss sections would require "double

---

[2] Galvanization is characterized as a process of "dipping pieces of steel into tanks of zinc heated to 830-850 degrees Fahrenheit," so that "[w]hen the steel is removed, it retains a zinc coating [to protect it against] corrosion." (Def.'s 56.1 ¶ 10 n.1.)

2

dipping."[3] The process of double dipping is not unusual; according to Wolak, double dipping is conducted at the Reliable plant everyday. (Wolak Dep. 14:8-10.) Eisner explained in his deposition, however, that the nature of this process can lead steel to warp because it requires one end of the truss to remain in the air while the other is dipped, which causes uneven heating. (Eisner Dep. 11:20-24.) After several truss section were dipped at the Reliable plant, Wolak heard a "tink sound, like a hammer on metal" and noticed "the welds were popping [and cracking] as they were cooling . . . ."[4] (Wolak Dep. 10:5-15.) Wolak reported the cracking to Michael Eisner, and Eisner directed Wolak to contact David Larson at Northshore to ask whether Reliable should continue the galvanization process on the remaining truss sections. (Wolak Dep. 11:18-22; Eisner Dep. 26:11-18.) Wolak claims he asked Larson for authorization about how to proceed and that Larson directed Reliable to continue galvanizing the remaining trusses. (Wolak Dep. 12:3-8.) Plaintiff denies that this conversation took place, however. According to Plaintiff, no one from Reliable contacted Larson until the entire galvanization project was complete, and Larson was never informed about the damaged condition of the trusses. (Larson Dep. 37:6-24, 38:2-20, Nov. 11, 2009.)

All of the truss sections were ultimately galvanized by Reliable and delivered directly to the jobsite in three separate shipments. (Def.'s 56 ¶ 20.) Once the first two shipments arrived on July 26, 2006, Dale Zifko, Lakehead's jobsite superintendent, and John Romain, Consumers' construction manager coordinator, inspected the trusses and noted several bent truss plates and cracked welds. (Zifko Dep. 31:2-18, 160:22-25; Romain Dep. 9:18-24.) Consumers determined

---

[3] A double-dip galvanization process involves dipping half of a steel truss into a galvanizing tank for approximately five minutes, setting it aside for ten minutes to cool and then dipping the other half. (Wolak Dep. 13:15-22; 51:14-24; 52:1-3).

[4] Wolak explained that the welds may crack "because the steel expands on a fabrication when it's heated and the rate of expansion will cause different components to move and as they are cooling, the frames are moving and . . . will find a weak point and crack." (Wolak Dep. 11:1-5.)

3

that, due to time constraints, rather than ordering new fabricated steel, workers would repair the trusses at the jobsite. (Romain Dep. 21:9-25, 79:19-25, 80:1-13.) Scott Hautala, Lakehead's senior project manager, informed Dan Larson—Northshore's Vice President and David Larson's brother—that several of the truss sections had arrived "warped and distorted" with numerous "visibly cracked welds." (Hautala Aff. ¶ 8.) Hautala asked Larson to send a representative from Northshore "to Reliable's facility to ensure the quality of the third truckload prior to shipping." (Hautala Aff. ¶ 8.) Northshore acknowledges that Hautala made the request and admits that it nevertheless chose not to send a representative to Reliable. (Plaintiff's Response to Def.'s Local Rule 56.1 Statement of Undisputed Facts (hereinafter, "Pl.'s Resp.") ¶ 20.)

**C.      Load Testing**

In order to determine the severity of the weld cracks, Lakehead hired Materials Testing Consultants ("MTC") to perform a "non-destructive inspection" of the trusses. (Def.'s 56 ¶ 25.) On July 27, 2006, Darrin Gehler, an MTC employee and certified weld inspector, performed magnetic particle testing on each welded section, and Lakehead employees began repairing the cracks revealed by the initial testing. (Def.'s 56 ¶ 26.) Once the repairs were complete, Gehler retested the welds and Lakehead employees covered the repaired welds with a "cold-galv compound."[5] (Def.'s 56 ¶ 26.) Gehler stated in his deposition that once the repairs were complete, the truss section welds appeared to comply with applicable industry standards.[6] (Gehler Dep. 105:6-9.) Still, given the number of cracks found, David Krech, the lead engineer for KOA, was not convinced that MTC had detected every defect and feared that there could be "latent, non-visible defects." (Krech

---

[5]      Cold-galv is "a zinc-rich compound that, when applied to steel, bonds to the surface to provide protection against wear and corrosion similar to hot-dip galvanizing." (Def.'s 56 ¶ 26 n.7.)

[6]      Gehler, as well as the parties here, rely upon the provisions set forth in the Structural Welding Code, AWS D1.1, which defines industry standards for fabricating and erecting welded steel structures. (Gehler Dep. 51:3-8.)

Dep. 51:12-52:7.) Therefore, Krech determined that in order to discover any non-visible cracked welds and ensure that the truss sections did not collapse during installation, the trusses would need to undergo "load testing" to ensure their integrity. (Def.'s 56 ¶ 26; Hautala Aff. ¶ 16.) Load testing "consist[s] of placing large concrete blocks on the assembled trusses to measure the trusses' flexion, ensure the integrity of the repaired welds, and determine the presence of non-visible cracked welds." (Def.'s 56 ¶ 30.) Lakehead claims that prior to conducting the load test, Hautala informed Dan Larson about the procedure and gave Larson an opportunity to express his opinion. (Def.'s 56 ¶ 28.) Plaintiff admits that Larson received an e-mail from Hautala about the load testing, but claims "Northshore was never consulted by Lakehead as to whether or not load testing was even necessary." (Pl.'s Resp. ¶ 28.)

On July 28, 2006, the third shipment of trusses arrived at the jobsite. Like the earlier shipments, this third shipment included trusses with damaged sections. (Odermann Aff. ¶ 6.) In the days that followed, Lakehead's then-president, Donald Odermann, met with representatives from Northshore, Consumers, and KOA. The parties agreed that Lakehead would repair the majority of the damaged truss sections at the jobsite, and that Plaintiff would refabricate and arrange for the galvanization of the sections that were damaged beyond repair. (Odermann Aff. ¶ 7.) At some point during their meeting, Odermann warned Dan Larson that "Lakehead would deduct the costs of repairing the damaged sections from the amount Lakehead had agreed to pay [Plaintiff] under the subcontract." (*Id.*) Plaintiff admits that it participated in the meeting with Odermann and other representatives about the repairs, and that it understood costs would be deducted from the price Lakehead would pay, but Plaintiff contends it understood the deducted "costs" to refer only to "the bent angles and correcting the cracked welds in the field," not to the load testing. (Pl.'s Resp. ¶ 22.)

Lakehead proceeded with the load testing in September 2006, and Krech determined that the truss sections were structurally sound. (Def.'s 56 ¶ 31.) Lakehead subsequently deducted the

5

costs it incurred in "repairing the truss sections, including the MTC testing, stripping and rewelding, and load testing, from the amount it owed plaintiff under the subcontract," (Def.'s 56 ¶ 32) and sent Plaintiff an invoice for $269,556.82—the amount currently in dispute.

**D.     Release Agreements**

Notwithstanding this amount in dispute, Lakehead made various payments to Plaintiff as agreed upon in their subcontract from May 2006 to April 2007. With each payment received, Plaintiff also executed a release agreement entitled "Subcontractor's Release and Partial Waiver." (Release Agreements, Ex. 4 to Hautala Aff.) Under these release agreements, Plaintiff agreed to "wave and release any and all claims of any nature which [Northshore] has or may have against [Consumers], or Lakehead Constructors, Inc. . . ." in return for payment. (*Id.*) The release agreements further state: "[Northshore] hereby releases all lien rights relating to the [construction project] and all labor, materials services or goods provided pursuant to or related to the [construction project]." (*Id.*) In total, Plaintiff appears to have accepted $1,021,457.75 in payments from Lakehead, including nine payments totaling $833,406.75 after August 25, 2006, when the load testing began. Plaintiff does not dispute that it accepted these payments, but claims the release agreements do not bar its claims in this lawsuit. (Pl.'s Resp. ¶ 33.)

## **ANALYSIS**

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Once the moving party has set forth the basis for summary judgment, the nonmoving party must cite to particular parts of the materials in the record to show the presence of a genuine dispute. FED. R. CIV. P. 56(c).

The parties agree that Michigan law governs this case, as stated in the subcontract, and that Plaintiff's claim involves a sale of goods, governed by relevant provisions of Article 2 of the Uniform Commercial Code, as adopted in Michigan. They disagree, however, about several relevant facts,

6

as well as the meaning of the subcontract and release agreements. Defendant presents two primary issues in its motion for summary judgment: (1) whether Defendant was entitled to deduct the load testing costs from the amounts it owed Plaintiff, and (2) the meaning of the release agreements. For the following reasons, the court concludes Plaintiff has not established any dispute of material fact concerning Defendant's right to recovery of the costs of load testing.

### A. Deducted Payments for Load Testing

In Michigan, "injured parties must make every reasonable effort to minimize their damages; . . . [typically the] burden is on [the party in breach] to establish that [the nonbreaching party] has not used such efforts." *Gorman v. Soble*, 120 Mich. App. 831, 846, 328 N.W.2d 119, 127 (Mich. App. 1982) (citing *Williams v. American Title Ins. Co.*, 83 Mich. App. 686, 697, 269 N.W.2d 481, 486 (Mich. App. 1978). Michigan also recognizes the "duty to mitigate damages in breach of contract cases subject to the UCC." *TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 550 (6th Cir. 1981) (citing *Ambassador Steel Co. v. Ewald Steel Co.*, 33 Mich. App. 495, 504, 190 N.W.2d 275, 280 (Mich. App. 1971)). Here, it is Northshore, the seller of the goods at issue, who has brought suit, but Lakehead, the buyer, which was required to take steps to cure problems with the shipped goods. Plaintiff admits that some of the truss sections arrived at the jobsite with cracked welds and bent angles, and agrees that Lakehead was entitled to deduct the costs of repairs from the payments owed to Northshore. (Pl.'s Resp. Mem. at 1.) Plaintiff's primary argument is that load testing the truss sections was unnecessary and unreasonable, and therefore, Defendant is not entitled to deduct the costs of that testing from the amount it owes Plaintiff. Defendant argues that Plaintiff was warned about the load testing before it occurred, and that Lakehead was justified in deducting the testing costs from the payments it owed to Plaintiff.

The subcontract between Northshore and Lakehead makes no mention of the possibility of load testing, nor does it explain which party bears the burden of paying any quality control costs. Plaintiff suggests that Lakehead acted improperly in passing the costs of the load testing on to

Northshore, because "Northshore had no say in the decision making process," (Pl.'s Resp. Mem. at 7) and contends that David Larson, Northshore's plant manager, was not aware that Lakehead planned to load test the truss sections before the testing occurred. (Pl.'s Resp. ¶ 23.) In the court's view, his deposition testimony is more equivocal.[7] Dan Larson, however, admitted that he did know about the load testing and that Scott Hautala asked him for his perspective on the testing prior to it taking place.[8] (Dan Larson Dep. 125:22-24; 126:17-22.) Thus, as Defendant asserts, "Northshore was given the opportunity to participate in finding the solution to the problem . . . but it declined to object or participate." (Def.'s Reply Mem. at 7-8.) In any event, whether or not Plaintiff knew of the load testing before it occurred, both parties seem to implicitly assume that if

---

[7] Opposing counsel questioned him about when exactly he discovered Lakehead planned to load test the trusses and Larson responded as follows:

Q. So your testimony is that you personally didn't know what the cost of the repair would be until after the load testing was done?
A. Correct.
Q. Okay. But you knew before the load testing was performed that load testing was going to be performed.
A. I wasn't aware of load testing.
. . .
Q. So how did you find out that load testing had been performed?
A. Probably through Dan [Larson].
Q. And when did he tell you that?
A. Probably before they load tested it.
. . .
Q. So obviously if [Dan Larson] told you [Lakehead planned to] load test the trusses, this conversation took place before the testing occurred.
A. Possibly. When—when the first problem came in, he told me, yep . . . [Lakehead is] going to replace the bent angles . . . [and] fix the cracked welds, have them inspected. At that time he did not tell me about load testing because he didn't know about it at that time. Later on, it could have been a month or two or three later, I don't remember, but that's when he told me about the load testing.

(David Larson Dep. 23:23-24:11; 37:8-18, Dec. 9, 2009.)

[8] Asked at his deposition whether he approved of the load testing before it occurred, Dan Larson responded: "My role was to supply the material. . . . [W]hat they're asking for from me was beyond what I'm capable of providing . . . . I didn't approve and I didn't disapprove it." (Dan Larson Dep. 127:8-15.)

the load testing was in fact necessary, then Defendant was entitled to deduct the costs from its payments to Plaintiff.

Plaintiff asserts that whether load testing was necessary is a disputed issue. In Plaintiff's view, Defendant failed to mitigate its damages by refusing to question KAO's decision to load test the truss sections and failing to explore other options. (Pl.'s Resp. Mem. at 4, 7.) Notably, however, Plaintiff does not identify what steps short of load testing would have been appropriate in this case. As noted above, after Lakehead employees discovered the cracked welds, it hired Darrin Gehler to inspect the truss sections and conduct magnetic particle testing. Gehler stated in his deposition that after initial repairs were made on the truss sections, the welds appeared to comply with the Structural Welding Code, AWS D1.1, which defines industry standards for fabricating and erecting welded steel structures. (Gehler Dep. 51:3-8; 105:6-9.) By contrast, David Krech explained that while he was "comfortable that every defect that had been found had been repaired[,]" he was nevertheless concerned "that there might have been latent non-visible defects." (Krech Dep. 51:22-52-3.)

It is undisputed that UCC § 2-715 authorizes recovery of the "expenses reasonably incurred in inspection . . . of goods rightfully rejected. . . ." M.C.L. § 440.2715. Plaintiff contends, however, that Krech's desire to be "extra careful" in ordering the load tests caused an unnecessary expense, because no industry standards required it. (Pl.'s Resp. Mem. at 4.) In response, Defendant urges that "Gehler's determination that the repaired welds conformed to AWS standard D1.1 is not conclusive that Northshore's breach of warranty had been cured." (Def.'s Reply Mem. at 3.) Defendant emphasizes, further, that Krech's recommendation for load testing left Defendant with little choice: "Krech, as the structural engineer of record . . . was required under Michigan law to verify that the truss sections . . . were structurally sound . . . ." (Def.'s Reply Mem. at 6.)

Not surprisingly, case law does not directly address the question of how much testing is too much, for purposes of the duty to mitigate. It appears, however, that the courts do not ordinarily

second-guess a disappointed purchaser's efforts to determine the quality of goods. Defendant cites *Bolkum v. Staab*, 133 Vt. 467, 472, 346 A.2d 210, 213 (1975), where the Vermont Supreme Court concluded that UCC § 2-715 authorizes recovery of the expense of hiring a professional consultant to identify structural defects in a newly constructed house. *Happy Dack Trading Co. v. Agro-Industries, Inc.*, 602 F. Supp. 986 (S.D.N.Y. 1984), involved a contract for the sale of polyethylene resin for resale in China. The resin provided by the defendant did not meet standards, and the court concluded that the buyers were entitled to recover the expense they incurred in traveling to China to test the resin. In *Warren v. Guttanit, Inc.*, 317 S.E.2d 5 (N.C. App. 1984), plaintiffs sued the supplier of roofing materials after the roof of the warehouse plaintiffs owned began to leak. On appeal, the court concluded the trial judge had erred in refusing to award plaintiffs the costs they incurred for inspection and testing of the roofing materials. The fact that the tests were useful to the plaintiffs in the litigation did not justify denying recovery: "[T]he cost of inspections and tests to determine the nature or extent of the goods' defects is clearly recoverable as incidental damages under [UCC § 2-715], and the inspection of the materials was clearly both reasonable and necessary." 69 N.C. App. at 115, 317 S.E.2d at 13. *See also Keller v. Inland Metals All Weather Conditioning, Inc.*, 139 Idaho 233, 76 P.3d 977 (2003) (approving award of the costs of an employee's time spent gathering temperature and humidity data and transporting water samples for testing the function of a dehumidifier); *Adam Metal Supply, Inc. v. Electrodex, Inc.*, 386 So. 2d 1316 (2nd Dist. Fla. App. 1980) (manufacturer who purchased defective aluminum sheeting was entitled to recover the expense of shearing the aluminum sheets to determine that the shipment was nonconforming).

An Illinois case cited by Defendant is perhaps most instructive: In *S. M. Wilson & Co. v. Reeves Red-E-Mix Concrete, Inc.*, 39 Ill. App. 3d 353, 350 N.E.2d 321 (5th Dist. 1976), months after a concrete floor had been poured, plaintiff, a general contractor, discovered that the slab lacked sufficient "compressive strength." 39 Ill. App. 3d at 355, 350 N.E. 2d at 323. The contractor

conducted load testing on the slab "[a]t the insistence of the architect," and the court agreed that the cost of this testing was a "reasonable incidental expense" recoverable from the concrete supplier under UCC § 2-715. *Id.* at 355, 358, 350 N.E.2d at 323, 325.

As reflected in these cases, UCC § 2-715 is interpreted generously to permit recovery of the costs of inspection and testing of defective products. Plaintiff bears the burden of proving Defendant's failure to mitigate. On the record presented here, Plaintiff has not satisfied the court that the duty to mitigate damages required Defendant to override the recommendation of the project's structural engineer. The court finds no genuine dispute of material fact on this issue and concludes that Defendant is entitled to judgment as a matter of law on its claim for a setoff.

### B. Release Agreements

Defendant suggests that it is alternatively entitled to summary judgment because under the unambiguous terms of the release agreements, Plaintiff has waived all claims against Lakehead. Plaintiff argues that the broad language of the release agreements is in direct contravention of the subcontract and not enforceable. (Pl.'s Resp. Mem. at 8.) The court is skeptical of Defendant's broad reading, as it would suggest that once Plaintiff had accepted even a single one of several installment payments, Plaintiff was not entitled to any more. In light of its resolution of Plaintiff's claim on the merits, however, the court need not address this issue.

### CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [75] is granted, and this case is dismissed with prejudice.

ENTER:

Dated: March 14, 2011

_____
REBECCA R. PALLMEYER
United States District Judge